UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| Energy Pipe & Equipment Rentals, LLC,<br><br>Plaintiff,<br><br>v.<br><br>United States,<br><br>Defendant. | Court No. 1:25-cv-00184 |

**COMPLAINT**

Energy Pipe & Equipment Rentals, LLC ("Energy Pipe"), by and through its attorneys, hereby allege the following for its Complaint against the United States, acting by and through U.S. Customs and Border Protection ("CBP"):

**CONTESTED DETERMINATION**

1. This action is an appeal from CBP's final affirmative determination of evasion of the antidumping ("AD") and countervailing duty ("CVD") orders A-570-943 and C-570-944, respectively, covering oil country tubular goods ("OCTG") from the People's Republic of China ("China") (collectively, the "OCTG Orders"). CBP's final determination covers OCTG entered by Energy Pipe from February 1, 2023, through the pendency of the investigation, and is identified by "EAPA Consolidated Case No. 7890."

2. CBP published the final affirmative determination of evasion on July 2, 2025. *See* Admin. Review Determination in EAPA Consolidated Case No. 7890, CBP Office of Trade Regulations & Rulings (July 2, 2025).

## JURISDICTION

3. Energy Pipe brings this challenge to CBP's determination pursuant to section 1517(g) of the Tariff Act of 1930, as amended by the Trade Facilitation and Trade Enforcement Act of 2015 ("EAPA"). *See* 19 U.S.C. § 1517(g).

4. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1581(c), which provides the Court with exclusive jurisdiction over all civil actions commenced under 19 U.S.C. § 1517.

## STANDING

5. Energy Pipe is a U.S. importer of merchandise subject to CBP's evasion investigation and is an interested party within the meaning of 19 U.S.C. § 1517(a)(6) and 28 U.S.C. § 2631(k)(1).

6. Further, following CBP's determination of evasion, Energy Pipe is subject to antidumping and countervailing duties and is therefore adversely affected or aggrieved by agency action within the meaning of section 702 of the Administrative Procedure Act, as amended, 5 U.S.C. § 702, and is entitled to commence this action pursuant to 28 U.S.C. § 2631(i).

## TIMELINESS

7. Energy Pipe is commencing this action with the concurrent filing of a summons and complaint, within 30 business days after publication of CBP's July 2, 2025 final evasion determination, and has adhered to all the service and notification requirements as set out by the Rules of this Court. *See* USCIT R. 3, 4. Accordingly, Energy Pipe has timely commenced this action pursuant to 19 U.S.C. § 1517(g)(1).

## STATEMENT OF FACTS

8. Energy Pipe is a small, family-owned company with limited staff located in southern Louisiana which focuses exclusively on the sale and rental of pipe and certain oilfield

equipment. Energy Pipe is a first-time importer of merchandise, which, prior to importing OCTG that is subject of this action, sourced pipe from domestic sources.

9. Most of Energy Pipe's inventory is purchased from local oilfield companies and online auctions. Beginning in 2019, it became more difficult to obtain pipe from domestic sources because the demand for their products was so high. Based on a recommendation from another reputable company, Energy Pipe inquired into importing pipe from Thai Oil Pipe Co., Ltd. ("TOP"), a producer of OCTG in Thailand.

10. Before importing from TOP, Energy Pipe's principal, Dean Angelle, visited TOP's plant twice in 2019. Mr. Angelle confirmed in person that TOP had the capacity to manufacture the OCTG that Energy Pipe required in the size, strength and quantities that it required. He also confirmed TOP had an American Petroleum Institute ("API") license for producing the OCTG Energy Pipe required.

11. Energy Pipe also engaged a licensed Customs broker, Aries Worldwide Logistics ("Aries"), to process the imports. Energy Pipe relied on Aries to advise it of any Customs issues, having found Aries on CBP's Permitted Customs Brokers Listing.

12. The first time Energy Pipe imported OCTG from TOP was in April 2022.

13. For each shipment received from TOP, Energy Pipe reviewed the full package of accompanying documents, which included an Official Country of Origin Certificate issued by the Thai Chamber of Commerce. All these certificates were compared with the documentation and the product received in each shipment.

14. Once Energy Pipe received the paperwork, it was turned over to Aries. Aries confirmed the country of origin and manufacturer as TOP if it was not listed on the commercial invoice, packing list or Importer Security Filing.

15. Notwithstanding the thorough review undertaken by Energy Pipe ensuring the correct country of origin of its OCTG imports to be Thailand, on January 18, 2024 and February 1, 2024, the U.S. OCTG Manufacturers Associations ("UOMA") submitted allegations to CBP that several U.S. importers including Energy Pipe (collectively, "U.S. importers") evaded the OCTG Orders by entering Chinese-origin OCTG that were transshipped through Thailand by Petroleum Equipment (Thailand) Co., Ltd. ("PET") and Thai Oil Pipe Co., Ltd. ("TOP"). *See OCTG from the People's Republic of China: Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order*, 75 Fed. Reg. 3,203 (Jan. 20, 2010); *OCTG from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order*, 756 Fed. Reg. 28,551 (May 21, 2010).

16. On February 1, 2024, CBP's Trade Remedy Law Enforcement Directorate ("TRLED") acknowledged receipt of the allegations, and on February 23, 2024, CBP initiated an EAPA investigation.

17. On March 6-7, 2024, CBP issued Form 28 (CF-28) questionnaires to each of the U.S. importers concerning certain entries of OCTG and requested corresponding entry and production documentation. Energy Pipe timely submitted a CF-28 response concerning its entry from TOP.

18. On May 31, 2024, CBP issued a Notice of Initiation of Investigation and Interim Measures based upon a "reasonable suspicion" that the U.S. importers imported Chinese-origin OCTG into the United States that had been transshipped through Thailand. The notice informed that the entries covered by the investigation were those entered for consumption, or withdrawn from warehouse for consumption, from February 1, 2023, through the pendency of the investigation.

19. CBP issued Requests for Information to each of the U.S. importers and exporters, including Energy Pipe, requesting a wide range for information such as manufacturer information, raw material documentation, mill certificates, purchase orders, commercial invoices, transportation documentation, and proof of payment.

20. On July 9, 2024, Energy Pipe timely submitted a response regarding its entries of OCTG, all of which had been manufactured by TOP. TOP also timely submitted a response.

21. After conducting verification at TOP's and PET's facilities, TRLED issued a determination on February 24, 2025, that there was substantial evidence that the U.S. importers, including Energy Pipe, imported merchandise covered by the OCTG orders through evasion.

22. Between April 4, 2025, and April 7, 2025, six U.S. importers, including Energy Pipe separately submitted requests for administrative review.

23. On July 2, 2025, CBP's Office of Trade, Regulations and Ruling ("R&R") issued its administrative review determination affirming TRLED's February 24, 2025 determination.

## STATEMENT OF CLAIMS

### COUNT ONE

24. Paragraphs 1 through 23 are incorporated by reference.

25. TRLED's and R&R's determinations that Energy Pipe entered covered merchandise through evasion are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

26. The premise of TRLED's and R&R's determinations is that TOP used Chinese-origin "mother pipe," which was hollow and circular, as the raw material in producing OCTG in Thailand. According to TRLED and R&R, "mother pipe" was covered by the scope of the OCTG orders. They consequently concluded that "mother pipe" used by TOP in producing OCTG was

essentially Chinese-origin OCTG in all respects but name, and that U.S. importers importing OCTG from TOP evaded the OCTG orders.

27.     That premise, however, is inapplicable to Energy Pipe's imports of OCTG from TOP.  That is because Energy Pipe's imports of OCTG were not produced by TOP using "mother pipe."  Rather, they were produced using solid steel billets, which, unlike "mother pipe," does not meet the scope definition of the OCTG Orders.

28.     In concluding that Energy Pipe evaded the OCTG orders, TRLED and R&R ignored the significant information on the record demonstrating that all of Energy Pipe's imports of OCTG from TOP were produced from solid steel billets, and not from hollow "mother pipes."

29.     Such supporting record evidence included, but is not limited to:  (1) entry documents and sales, ordering, and production emails, invoices, purchase orders, and mill certifications demonstrating that all of Energy Pipe's entries of OCTG from TOP were produced from solid steel billets; and (2) CBP's verification report of TOP's facilities, in which it documented how the verification team observed the factory producing L80-1 steel grade OCTG beginning from a solid steel billet and being covered in steel debris and dust, with debris and dust was floating in the air during production all of which was indicative of a factory that operates regularly.  The verification team also observed that the factory workers at TOP were "actively participating in various production processes" during the factory tour and that the workers operating machinery who were interviewed "were able to demonstrate their knowledge of the machinery and showed example records that were produced from their test."

30.     By ignoring this contradictory evidence, TRLED and R&R failed to render a determination supported by substantial evidence as required under 19 U.S.C. § 1517(c)(1)(A) & (f).

**COUNT TWO**

31. Paragraphs 1 through 30 are incorporated by reference.

32. TRLED's and ORR's determinations are also arbitrary, capricious, an abuse of discretion, and otherwise not in accordance given their lack of any specific findings supporting evasion with respect to Energy Pipe's entries of OCTG from TOP.

33. Rather, TRLED examined the entry documents of a completely different U.S. importer, which caused it to question the accuracy and reliability of TOP's raw material documents. Notably, however, TRLED never reviewed nor made any findings with respect to the raw material documents pertaining to Energy Pipe's imports from TOP.

34. TRLED also cited to TOP's "multiple, false statements" with respect to its bank accounts and affiliated companies as causing it to question the accuracy and reliability of TOP's documents. However, TOP's statements regarding bank accounts and affiliations are irrelevant to the question of whether the OCTG imported by Energy Pipe were produced from solid steel billets or "mother pipe."

35. For its part, R&R simply focused on a purported lack of documentation of certain production steps of solid steel billets in finding evasion by Energy Pipe. In doing so, R&R failed to explain the logic or make specific findings regarding how Energy Pipe could have possibly imported Chinese-origin OCTG if TOP did not perform the necessary steps to transform solid steel billets (as was clearly documented as the raw material used in Energy Pipe's OCTG imports) into finished OCTG.

36. TRLED and R&R failed to articulate a rational connection between the facts found and the affirmative evasion determination with respect to Energy Pipe.

## COUNT THREE

37. Paragraphs 1 through 36 are incorporated by reference.

38. At bottom, to reach their strained findings of evasion with respect to Energy Pipe, TRLED and R&R relied upon the adverse inferences provision, 19 U.S.C. § 1517(c)(3), to draw a broad inference that was adverse to the interest of TOP that all of the OCTG that it exported into the United States during the POI was Chinese-origin OCTG. Indeed, TRLED explicitly stated its application of an adverse inference with respect to TOP. And while R&R claims it did not rely on adverse inferences, it effectively did so because it could not have reached an affirmative finding without inferring that all of TOP's OCTG, including Energy Pipe's entries, were produced using "mother pipe."

39. Rather than apply an adverse inference to Energy Pipe, a first-time importer that cooperated fully with CBP's investigation and provided all required information and documents regarding its imports from TOP, TRLED should have examined the evidence and made findings specific to Energy Pipe.

40. In declining to do so, TRLED's and R&R unreasonably interpreted the statute as allowing "collateral consequences" to a U.S. importer that resulted from its application of adverse inferences to an exporter is unreasonable. While the statute permits adverse inferences to be used against a non-cooperating party even when information is obtained from other sources, the statutory language does not, as CBP extrapolates, address nor does it plainly permit that the consequences of that inference may impact the interest of a cooperating importer.

41. TRLED's and R&R's reliance upon an inference that was adverse to the interest of exporter TOP to serve as the basis of concluding that importer Energy Pipe evaded the OCTG Orders runs contrary to the EAPA statute and was, therefore, not in accordance with law.

## **PRAYER FOR RELIEF**

For the reasons stated above, Energy Pipe respectfully requests that this Court:

1. Enter judgment in favor of Plaintiff;

2. Hold and declare that CBP's finding that Energy Pipe entered merchandise by means of "material and false" statement or "material" omissions was arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law;

3. Hold and declare that CBP's evasion determination was arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law; and

4. Grant such other relief as may be just and proper.

Dated: August 14, 2025

Respectfully submitted,

/s/ *Lydia C. Pardini*

Deanna Tanner Okun
Dominic Bianchi
Lydia C. Pardini
Jane C. Dempsey
Alissa M. Chase
Joonho Hwang
**Polsinelli PC**
1401 I ("Eye") Street, NW
Suite 800
Washington, DC 20005

*Counsel to Energy Pipe & Rentals, LLC*